**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| NEWPORT CAPITAL GROUP, LLC, | CIVIL ACTION NO. 11-2755 (MLC) |
|     Plaintiff, | **MEMORANDUM OPINION** |
|     v. | |
| JEFFREY LOEHWING, et al., | |
|     Defendants. | |

**COOPER, District Judge**

### I.    INTRODUCTION

The plaintiff, Newport Capital Group, LLC ("Newport"), brings this action against former Newport employee Jeffrey Loehwing and his current employer, CAPTRUST Financial Advisors, LLC ("Captrust").  (See dkt. entry no. 40, Am. Compl.)  Newport seeks damages from Loehwing for, inter alia, the alleged breach of a "Confidentiality, Non-Disclosure and Non-Solicitation Agreement" ("Agreement") that Loehwing executed while employed by Newport.  (See generally id. at Count II.)  The Agreement, as described more fully below, contains a covenant that prohibits Loehwing from soliciting business from Newport's clients and prospective clients ("Non-Solicitation Covenant").

Loehwing now moves for summary judgment in his favor and against Newport on Count II of the Amended Complaint ("Count II"), insofar as that count concerns application of the Non-Solicitation

Covenant to Newport's prospective clients.  (See dkt. entry no. 64,
Notice of Mot.; dkt. entry no. 64-3, Loehwing Br.).[1]  Loehwing
argues that the Non-Solicitation Covenant, as applied to Newport's
prospective clients, is overbroad and unenforceable under New
Jersey law.  (See Loehwing Br. at 9-17; dkt. entry no. 72, Loehwing
Reply Br. & Opp'n to Cross Mot. ("Loehwing Reply Br.") at 1-8.)

        Newport opposes the Motion and cross-moves for summary
judgment in its favor and against Loehwing on Count II.  (See dkt.
entry no. 67-3, Newport Br. & Opp'n to Mot. ("Newport Br.").)
Newport argues that the Non-Solicitation Covenant is enforceable as
applied to both its clients and prospective clients.  (See Newport
Br. at 20-29.)  Loehwing opposes the Cross Motion.  (See Loehwing
Reply Br.)

        The Court has considered both the Motion and Cross Motion
without oral argument pursuant to Local Civil Rule 78.1(b) and, for
the reasons that follow, concludes that the Non-Solicitation
Covenant is: (1) enforceable as applied to Newport's actual
clients; and (2) unenforceable as applied to Newport's prospective
clients.  The Court will thus grant the Motion, grant the Cross

---

[1] Loehwing states that he seeks "summary judgment on Newport's
claims to the extent that they extend to" Newport's prospective
clients.  (Loehwing Br. at 1.)  It nevertheless appears that he has
merely presented argument related to Count II; he has not cited
legal authority or otherwise submitted argument concerning, e.g.,
breach of fiduciary duties or misappropriation of trade secrets.
(But see Am. Compl. at Count I, Count III.)

Motion insofar as it concerns Newport's actual clients, and deny the Cross Motion insofar as it concerns Newport's prospective clients.

## II.   BACKGROUND [2]

Loehwing is, and at all times relevant to the action was, a financial advisor.  He provides consulting services to companies that offer defined contribution plans and defined benefit pension plans (collectively, "Retirement Plans") to their employees.  It appears that Loehwing generates fees for his employer by advising clients about the management of their Retirement Plan assets.  Loehwing asserts that he, like other financial advisors, could generate lists of potential clients by culling information from public documents that are maintained by the Pension Benefit Guaranty Corporation ("the PBGC"). [3]

_____

[2] Most of the facts recited here are undisputed.  (Compare dkt. entry no. 64-1, Loehwing Statement of Undisputed Facts ("Loehwing SOF"), with dkt. entry no. 67-2, Newport Response to Loehwing SOF; compare dkt. entry no. 67-1, Newport Statement of Undisputed Facts ("Newport SOF"), with dkt. entry no. 72-1, Loehwing Response to Newport SOF.)  The Court thus cites to the record only when quoting from it or addressing disputed factual issues.

[3] Congress established the PBGC by enacting the Employee Retirement Income Security Act of 1974.  See Connolly v. Pension Ben. Guar. Corp., 475 U.S. 211, 211 (1986).  It is a "wholly owned Government corporation [that] collects insurance premiums from covered private retirement plans and provides benefits to participants if their plan terminates with insufficient assets to support the guaranteed benefits."  Id.

Newport is a self-professed "integrated financial services firm providing customized investment and non-investment solutions to a diverse client base," which includes entities that offer Retirement Plans to their employees.  See Who is Newport Capital Group, NEWPORT CAPITAL GROUP, http://newportcapitalgroup.com/who-is-newport-capital-group (last visited Mar. 28, 2013).  It appears that Newport routinely purchases customized lists of prospective clients from a non-party entity, OneSource Information Services, Inc. ("OneSource").  In 2010, for example, Newport purchased two such prospective client lists from OneSource ("the OneSource Lists") for a total of $1,985.  Collectively, the OneSource Lists contained approximately 2,500 entries for prospective client contacts in Delaware, New Jersey, New York, and Pennsylvania.

Newport employs financial advisors, who solicit business from and market Newport's services to Newport's prospective clients.  To that end, Newport hired Loehwing, who began working for Newport on May 4, 2009.  As a Newport employee, Loehwing enjoyed access to certain Newport resources, including Newport's general marketing materials, prospect-specific marketing materials, pricing and sales strategies, and lists of (and contact information for) prospective clients.  Information relating to Newport's prospective clients came both from the OneSource Lists and leads generated by Newport employees.

4

Newport and Loehwing executed the Agreement on May 15, 2009.
In pertinent part, the Agreement states:

> In recognition of the highly confidential and
> proprietary nature of the Company's business methods and
> practices, I, during my employment/association with the
> Company, and for a period of twenty-four (24) months
> subsequent to termination of my employment/association .
> . . shall not, directly or indirectly, in any manner
> whatsoever:
>
>> a)   solicit to render, nor render . . . for the
>> benefit of any person or entity other than the
>> Company, any . . . business or financial services
>> rendered by the Company [to: (i) any] person or
>> entity who is a client (exclusive of immediate
>> family members) of the Company at the inception of
>> my employment, or becomes a client of the Company
>> during the term of my employment, . . .; or (ii)
>> any person or entity identified as a prospective
>> Company client (i.e. any and all individuals or
>> entities identified and/or contacted by [or who
>> contacts] [sic] the Company for the purpose of
>> becoming a Company client prior to the termination
>> of my employment) by me, by any other employee/
>> associate of the Company, or by the Company, during
>> the term of my employment. . . .

(Dkt. entry no. 67-6, Agreement, ¶ 5, Non-Solicitation
Covenant.)  The Agreement also states that these "restrictions
are not intended to deprive me of an opportunity to earn a
living in the same profession as that of the Company.  Rather,
I agree to abide by the above restrictions in recognition of
the Company's legitimate and reasonable objective to protect
its business interests."  (Id.)

5

Loehwing accepted an employment offer from Captrust on July 23, 2010, while still employed by Newport.  Captrust competes with Newport; like Newport, Captrust provides fee-based consulting services to companies that offer Retirement Plans to their employees.  Loehwing worked for Newport until September of 2010, when he voluntarily resigned and began working for Captrust.

Newport commenced this action on March 28, 2011.  It alleges, inter alia, that Loehwing violated the Non-Solicitation Covenant by soliciting Newport's clients and prospective clients after resigning from Newport's employ and beginning to work for Captrust. Loehwing and Newport have each detailed the nature of Loehwing's relationship and communications with eight such entities: (1) Severn Trent Services ("Severn"); (2) Kepco, Inc. ("Kepco"); (3) Crown Holdings, Inc. ("Crown"); (4) Novo Nordisk US ("Novo"); (5) Systra Consulting ("Systra"); (6) Tower Insurance Company of New York ("Tower"); (7) Immaculata University ("Immaculata"); and (8) Ursinus College ("Ursinus").  Newport and Loehwing agree that Severn, Kepco, Crown, Novo, Systra, and Tower were among Newport's prospective clients.  Insofar as the Motion and Cross Motion concern these and other prospective clients, the dispute between Newport and Loehwing is purely legal: that is, whether the Non-Solicitation Covenant is reasonable and enforceable.

Newport and Loehwing have, however, disputed the proper characterization of Immaculata and Ursinus.  Because this dispute affects resolution of the Motion and the Cross Motion, the nature of both Loehwing's and Newport's relationships with those entities requires further examination.

**A.    Immaculata**

Loehwing, before joining Newport, enjoyed an established relationship with Cathey Passin, an Immaculata human resources employee.  (See dkt. entry no. 64-4, Loehwing Decl. at ¶ 25; Loehwing SOF at ¶ 29(g).)[4]  During Loehwing's tenure at Newport, Passin posed questions to Loehwing concerning Immaculata's Retirement Plans, and Loehwing met Passin to answer those questions.  Loehwing asserts that he answered Passin's questions "gratis as a measure of good will and not pursuant to any business relationship." (Loehwing SOF at ¶ 29(g).)  He also asserts that he hoped to sway Immaculata toward engaging his services in the future by answering Passin's questions, and demonstrating his knowledge of and expertise relating to Retirement Plans.  (See Loehwing Response to Newport SOF at ¶ 31.)

---

[4] Newport failed to properly deny this assertion -- i.e., that Loehwing had an earlier-established relationship with Passin -- in its response to the Loehwing SOF.  (See Newport Response to Loehwing SOF at ¶ 29.)  This assertion, which finds support in the evidence of record, is accordingly deemed admitted for the purpose of resolving the Motion and Cross Motion.  See L.Civ.R. 56.1(a); McCann v. Unum Provident, No. 11-3241, 2013 WL 396182, at *3-4 (D.N.J. Jan. 31, 2013).

Newport does not dispute that Loehwing met with Passin and answered questions about the Retirement Plans that Immaculata offered to its employees.  However, it asserts that Loehwing both: (1) met with multiple Immaculata representatives, and met them to generally market Newport's services; and (2) received certain proprietary marketing materials before meeting with Immaculata's representatives.  (See id. at ¶¶ 31-32.)[5]

Newport also asserts that Immaculata was a "former client". (See id. at ¶ 33.)  Nevertheless, this assertion does not affect the Court's resolution of the Motion and Cross Motion because: (1) the assertion is not supported by competent evidence of record; and (2) the Non-Solicitation Covenant applies to clients (that is, entities engaged as clients during Loehwing's tenure) and prospective clients, but appears not to contemplate or provide relief for solicitation of "former clients".

**B.   Ursinus**

Newport asserts and Loehwing admits that Ursinus hired Newport to "undertake a one-time vendor cost analysis project for which Newport received $10,000" in 2009, during the period of Loehwing's

---

[5] Loehwing does not recall bringing any such marketing materials to his meeting with Immaculata.  (See Loehwing Response to Newport SOF at ¶ 32.)  However, because Loehwing has failed to rebut Newport's assertions regarding those marketing materials by reference to evidence of record, those assertions are deemed admitted for the purpose of resolving the Motion and Cross Motion. See L.Civ.R. 56.1(a); McCann, 2013 WL 396182, at *3-4.

employment by Newport.  (Loehwing Response to Newport SOF at ¶ 23; see also Newport SOF at ¶ 23; Newport Br. at 11-12.)  Newport also prepared a "Retirement Plan Consulting Proposal" ("Newport/Ursinus Proposal") for Ursinus in June of 2009.  (See dkt. entry no. 67-11, Newport/Ursinus Proposal.)  It appears that Ursinus did not act on the Newport/Ursinus Proposal, and that, when Loehwing terminated his employment by Newport, Newport did not have an active service agreement with Ursinus.  (See Loehwing SOF at ¶ 30; Newport Response to Loehwing SOF at ¶ 30.)

Newport asserts that Loehwing drafted a Captrust proposal for Ursinus ("Captrust/Ursinus Draft Proposal") while he was still a Newport employee, and that Captrust bid on and won Ursinus's business after Loehwing began working at Captrust.  (See Newport Br. at 12.)  The proposal drafted by Loehwing is substantially similar to both the Newport/Ursinus Proposal and the proposal ultimately submitted by Captrust ("Captrust/Ursinus Proposal").  (Compare dkt. entry no. 67-17, Captrust/Ursinus Draft Proposal, with Newport/Ursinus Proposal, and dkt. entry no. 67-18, Captrust/Ursinus Proposal.)

### III. STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.R.Civ.P.

56(a).  The movant has the initial burden of proving the absence of a genuinely disputed material fact relative to the claims in question.  See Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986).  Material facts are those "that could affect the outcome" of the proceeding, and "a dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable [trier of fact] to return a verdict for the non-moving party."  Lamont v. New Jersey, 637 F.3d 177, 181 (3d Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  The burden on the movant may be discharged by pointing out to the district court that there is an absence of evidence supporting the non-movant's case.  See Celotex, 477 U.S. at 323.

If the movant meets the initial burden, then the burden shifts to the non-movant to demonstrate that genuine issues of material fact exist that must be resolved at trial.  See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986); Williams v. Bor. of W. Chester, Pa., 891 F.2d 458, 460–61 (3d Cir. 1989).  The Court, when determining whether genuine issues of material fact exist, must view the evidence in the light most favorable to the non-movant, and draw all reasonable inferences in that party's favor.  See Scott v. Harris, 550 U.S. 372, 380 (2007); Wishkin v. Potter, 476 F.3d 180, 184 (3d Cir. 2007).

### IV.   DISCUSSION

The Court's resolution of the Motion and Cross Motion has three parts.  First, the Court must determine by reference to the Non-Solicitation Covenant whether each of the eight named entities -- i.e., Severn, Kepco, Crown, Novo, Systra, Tower, Immaculata, and Ursinus -- is a "client" or a "prospective client".  Second, the Court must then conclude whether the Non-Solicitation Covenant is enforceable as applied to Newport's clients.  Finally, the Court must conclude whether the Non-Solicitation Covenant is enforceable as applied to Newport's prospective clients.  The Court addresses each of these parts in turn.

### A.   Findings Regarding Clients and Prospective Clients

The parties agree that Severn, Kepco, Crown, Novo, Systra, and Tower are properly characterized as Newport's prospective clients. The Court accepts that characterization as an undisputed fact. (See Newport SOF at ¶¶ 25-27, 36-39, 41-43, 45; Loehwing Response to Newport SOF at ¶¶ 25-27, 36-39, 41-43, 45.)

The Court finds that Immaculata is also properly characterized as a prospective client.  Newport has not produced evidence that suggests that Immaculata either: (1) was a client when Loehwing began working for Newport; or (2) became a client during Loehwing's tenure as a Newport employee.  (Cf. Non-Solicitation Covenant (prohibiting solicitation of any "entity who is a client . . . of

11

the Company at the inception of my employment, or becomes a client during the term of my employment").)   The mere fact that Loehwing met with, answered questions for, and might have marketed Newport's services to Immaculata does not convert Immaculata from a prospective to an actual client.   Similarly, the Non-Solicitation Covenant, as noted above, does not contemplate or make accommodations for "former clients".

Ursinus, however, is properly characterized as a client. Ursinus, unlike Newport's prospective clients, paid Newport to render services on its behalf during Loehwing's tenure as a Newport employee.   (See Newport SOF at ¶ 23; Loehwing Response to Newport SOF at ¶ 23; cf. Non-Solicitation Covenant (referring to a client as, among other things, an entity that "becomes a client during the term of my employment").)

Loehwing argues that Ursinus was not a client because Newport did not have an active service agreement with Ursinus when Loehwing resigned from Newport's employ.   (See Loehwing Br. at 8; Loehwing Reply Br. at 10 n.3.)   This argument is unpersuasive.   The Agreement does not define the term "client" by reference either to active and ongoing service agreements, or to the date of the termination of Loehwing's employment.   Accordingly, the Court will not read those requirements into the Non-Solicitation Covenant. See Textron Fin.-N.J. Inc. v. Herring Land Grp., LLC, No. 06-2585,

2012 WL 1079613, at *16 (D.N.J. Mar. 30, 2012), aff'd sub nom. GF
Princeton, L.L.C. v. Herring Land Grp., L.L.C., Nos. 12-2228 & 12-
2357, 2013 WL 704106 (3d Cir. Feb. 27, 2013).  "When interpreting
[a contract], the Court must ascribe [the contract's] terms their
plain and ordinary meaning.  The Court may not read or enforce [the
contract's] provisions in a way that writes a different or better
contract for the parties."  Id. (citation omitted) (internal
quotation marks omitted).

**B.    The Enforceability of the Non-Solicitation Covenant**

Whether the Non-Solicitation Covenant is enforceable is a
question of law.  See Kieffer v. Best Buy, 205 N.J. 213,
222-23 (2011); Trenton Pass R. Co. v. Guarantors' Liab. Indem. Co.,
60 N.J.L. 246, 247 (N.J. 1897) (recognizing as question of law
"[w]hether the said contract . . . is a valid contract, or is void
as against public policy"); Bailey v. Palladino, No. A-0504-05T5,
2006 WL 2068136, at *4 (N.J. App. Div. July 27, 2006); see also 17A
Am. Jur. 2d. Contracts § 327 (2013).  Because the parties have not
evinced any genuine disputes of material fact, the question is ripe
for summary judgment.

The parties agree that this question is controlled by New
Jersey law.  The Court thus turns to the seminal New Jersey case
concerning the enforceability of non-solicitation covenants, Solari
Indus., Inc. v. Malady.  See 55 N.J. 571 (1970); see also A.T.

13

Hudson & Co., Inc. v. Donovan, 216 N.J. Super 426, 432-34 (App. Div. 1987) (applying Solari to an action concerning a non-solicitation clause, and recognizing Solari as the "seminal case"). Under Solari, non-solicitation covenants are enforceable only to the extent that they are reasonable in the circumstances. See A.T. Hudson & Co., 216 N.J. Super. at 432. To determine whether a non-solicitation agreement is reasonable, the Court must consider three factors, i.e., the extent to which the agreement: (1) is necessary to protect the employer's legitimate interests; (2) causes undue hardship on the former employee; and (3) impairs the public interest. See Solari, 55 N.J. at 585; A.T. Hudson & Co, 216 N.J. Super. at 432.

The New Jersey Supreme Court has explained that courts applying the Solari test must balance the first and second factors, which address the employer's and former employee's respective, competing interests. See Ingersoll-Rand Co. v. Ciavatta, 110 N.J 609, 634-35 (1988). "In cases where the employer's interests are strong, such as cases involving trade secrets or confidential information, a court will enforce a restrictive agreement. Conversely, in cases where the employer's interests do not rise to the level of a proprietary interest deserving of judicial protection, a court will conclude that a restrictive agreement

merely stifles competition and therefore is unenforceable." Id. at
635.

Employers have a reasonable interest in protecting "trade
secrets and other proprietary information, . . . and customer
relations." Id. at 636.  But employers have "no legitimate
interest in preventing competition." Whitmeyer Bros., Inc. v.
Doyle, 58 N.J. 25, 33 (1971).  Accordingly, the balance between the
first two Solari factors is delicate.  Courts attempting to balance
those factors must consider the employer's interests, but recognize
that the "knowledge, skill, expertise, and information acquired by
an employee during his employment become part of the employee's
person.  They belong to him as an individual for the transaction of
any business in which he may engage, just the same as any part of
the skill, knowledge and information received by him before
entering the employment.  An employee can use those skills in any
business or profession he may choose, including a competitive
business with his former employer." Ingersoll-Rand, 110 N.J. at
635 (citation omitted).

"Courts will not enforce a restrictive agreement merely to aid
the employer in extinguishing competition, albeit competition from
a former employee.  Ultimately, the consuming public would suffer
from judicial nurturing of such naked restraints on competition."
Id.; see also Whitmeyer, 58 N.J. at 33 (noting that employers have

"no legitimate interest in preventing competition); <u>Raven v. A. Klein & Co., Inc.</u>, 195 N.J. Super. 209, 213 (App. Div. 1984) (noting that employers have no legitimate interest in enforcing restrictive covenants "principally directed at lessening competition").

1.  **The Non-Solicitation Covenant is Enforceable as Applied to Newport's Clients, Including Ursinus**

Newport argues that the Non-Solicitation Covenant is enforceable as applied to entities that were Newport clients either at the inception of or otherwise during the term of Loehwing's employment at Newport. (<u>See</u> Newport Br. at 28-30.)  This argument rests on the clear and unambiguous language of the Non-Solicitation Covenant, and well-settled New Jersey law. (<u>See</u> Non-Solicitation Covenant (prohibiting solicitation of "any person or entity who is a client . . . of the Company at the inception of [Loehwing's] employment, or becomes a client of the Company during the term of [Loehwing's] employment").)

Loehwing does not dispute that the Court should enter judgment against him and in Newport's favor on Count II, insofar as that count concerns Newport's clients. (<u>See</u> Loehwing Reply Br. at 10 n.3 ("Loehwing does not argue that non-solicitation covenants related to <u>actual</u> as opposed to <u>prospective</u> customers are void." (emphasis in original)).)  He merely argues that Ursinus was not and should not now be characterized as a Newport client. (<u>But see</u>

16

Loehwing Br. at 8 ("As far as <u>actual</u> clients are concerned, this litigation involves only one entity, Ursinus College . . ., that could possibly be construed as a 'former client' of Newport." (emphasis in original)).)

The Court has already addressed Loehwing's argument, and found that Ursinus is properly characterized as a Newport client.  (<u>See</u> Section IV.A of this Memorandum Opinion, <u>supra</u>.)  The Court will not further address it here.  Because Loehwing does not otherwise dispute that Newport is entitled to relief, the Court will enter judgment on Count II, insofar as that Count concerns Newport's clients, in Newport's favor and against Loehwing.

**2.   The Non-Solicitation Covenant is Unenforceable as Applied to Newport's Prospective Clients**

Whether the Non-Solicitation Covenant is enforceable as applied to Newport's prospective clients appears to be a novel issue under New Jersey law.  The parties have not directed the Court to any New Jersey cases that apply the <u>Solari</u> test to a non-solicitation agreement that concerns prospective customers. Similarly, the Court has not found such cases through its own independent research.  Loehwing asserts that "no New Jersey court has upheld a non-compete clause as it relates to prospective clients."  (Loehwing Br. at 13.)

It appears that only one New Jersey case directly addresses an anti-competition clause (i.e., either a non-competition or

17

non-solicitation clause) relating to prospective customers.  The
Court will thus address it at length.

     In Platinum Management, Inc. v. Dahms, the Superior Court
addressed the enforceability of "an unusual non-competition
covenant" between Platinum Management, Inc. ("PMI") and its former
employee, Brian Dahms ("the PMI Covenant").  285 N.J. Super 274,
285 (Law Div. 1995).  PMI had hired Dahms as a vice president and,
as a condition of his employment, PMI and Dahms executed an
agreement stating, inter alia, that Dahms "would not solicit or
accept business from any PMI customers for anyone other than PMI".
Id.  The covenant extended through the term of Dahms's employment
by PMI, and for one year more.  See id.

     Dahms "was a key person, privy to the innermost secrets of the
company."  Id. at 284.  PMI's owner personally trained Dahms, and
introduced him "to PMI's customers and familiarized him with their
buying habits and personal attributes."  Id. at 284.

> When Dahms joined the staff of PMI in April 1988, he
> came into a key position which of necessity would expose
> him to PMI's most sensitive corporate information.
> Unlike other sales agents who PMI employed or with whom
> it contracted, Dahms had access to customer information
> of the entire sales force.  As Vice President of Sales,
> he had access to PMI's pricing policy and sales
> strategy, and assisted in the areas of new product
> development.  Additionally, unlike many sales agents, he
> did not arrive with his customers; virtually all of his
> customer relationships were developed on the payroll of
> PMI.  The non-competition covenant which PMI asked Dahms
> to sign was in recognition of his unique employee status

18

> and the damage he could inflict on PMI through the
> misuse of the knowledge he had acquired there.

Id. at 294.

Dahms subsequently terminated his employment with PMI and
began working for a PMI competitor, Great American Fun Corporation
("GAF").  PMI filed suit against both Dahms and GAF, and, insofar
as the action concerned Dahms, alleged that Dahms breached the PMI
Covenant by soliciting PMI's actual and prospective clients.  See
generally id. at 293.[6]

The Superior Court entered judgment in PMI's favor, insofar as
PMI asserted that Dahms breached the PMI Covenant by soliciting its
clients -- i.e., entities to whom PMI had sold product during the
term of Dahms's employment with PMI.  See generally id. at 294-98,
298-301.  This judgment rested on a full and complete analysis of
the Solari factors.  The Superior Court identified PMI's legitimate
interests, and then weighed those interests against both the
burdens imposed on Dahms and the potential impairment on the public
interest.  See id.  The Superior Court concluded that PMI had a
legitimate interest in protecting both its "proprietary and

---

[6] The PMI Covenant did not explicitly prohibit Dahms from
soliciting PMI's prospective customers -- i.e., entities from whom
PMI solicited but failed to secure business.  Nevertheless, it
appears that Dahms, PMI, and the court understood the PMI Covenant
to prohibit Dahms from soliciting PMI's prospective customers.  See
Platinum Mgmt., 285 N.J. Super. at 298.

confidential" information and its customer relationships.   See id.
at 295.   It stated that:

> [t]he information which PMI seeks to protect is not
> readily obtainable from trade directories and other
> publications, as GAF argues.   Although the customers'
> names may be listed in those publications, the fact that
> they are customers of PMI is not.   Their identity is
> entitled to protection when divulged in confidence to a
> key employee such as Dahms, where he is a party to a
> covenant not to compete.   The fact that such information
> may be available from public sources does not mean that
> the information is not confidential as between the
> parties.

Id. (citation omitted).

That court, however, reached a contrary decision insofar as it
determined that PMI's legitimate interests did not extend to its
purely prospective customers.   It concluded that "[t]he prohibition
in the covenant, . . . to the extent that it covers prospective
customers that were only solicited by PMI, is overbroad and, thus,
unenforceable."   Id. at 298.   The court then continued its analysis
insofar as it pertained to PMI's actual customers, and reached
certain conclusions pertaining to the burden imposed on Dahms and
the potential impairment on the public interest that are not
relevant to this action.   See id. at 298-301.

Loehwing, in support of the Motion, urges this Court to adopt
Platinum Management and void the Non-Solicitation Covenant insofar
as it concerns Newport's prospective clients.   He characterizes
that action's holding as an "unambiguous declaration that

restrictive covenants on prospective clients are impermissible". (Newport Br. at 12.)  He appears to argue that the Court should apply Platinum Management as a per se bar to post-employment non-compete and non-solicitation agreements.  (See id. at 11-13; Loehwing Reply Br. at 2-3.)

Newport raises two substantive arguments in opposition to this argument.  First, Newport argues that application of the Solari test demonstrates that the Non-Solicitation Covenant is reasonable and, thus, enforceable.  (See Newport Br. at 21-23.)  Second, and seemingly in the alternative, Newport argues that the Court should deem the Non-Solicitation Covenant reasonable and enforceable as to prospective clients with whom Loehwing had substantial dealings: i.e., Severn, Kepco, Crown, Novo, Systra, Tower, and Immaculata. (See id. at 23-27.)

The Court need not reach Loehwing's argument that Platinum Management represents a wholesale bar on post-employment restrictive covenants because it appears, upon consideration and application of the Solari test, that the Non-Solicitation Covenant is unreasonable and, thus, unenforceable as applied to Newport's prospective clients.

The Court acknowledges that Newport has a legitimate interest in protecting its relationships with actual clients.  Indeed, to the extent that the Non-Solicitation Covenant concerns such actual

21

clients, the Court has concluded that it is enforceable.  (See Section IV.B.1 of this Memorandum Opinion, supra.)  But Newport has failed to cite legal authority for the proposition that it has a legitimate interest in protecting its relationship with purely prospective clients.  To the extent that Platinum Management stands for the proposition that no such legitimate interest exists, this Court agrees.  See Platinum Mgmt., 285 N.J. Super at 298 (stating, in the context of analysis of plaintiff employer's legitimate interests, that the restrictive covenant at issue was "overbroad" and "unenforceable" as applied to employer's prospective clients).

The Court also acknowledges that Newport has a legitimate interest in protecting certain proprietary information, including (but not limited to) the information contained in the OneSource Lists.  It is of no consequence that the information contained in the OneSource Lists may have been compiled, at least in part, from publically available information.  See Ingersoll-Rand, 110 N.J. at 628 (recognizing a legitimate interest in "protecting trade secrets [and] confidential information"); Platinum Mgmt., 285 N.J. Super. at 294 (recognizing a legitimate interest in protecting "proprietary and confidential information"), 295 ("The fact that such information may be available from public sources does not mean that the information is not confidential as between the parties.").

But enforcing the Non-Solicitation Covenant and prohibiting Loehwing from soliciting any of Newport's prospective clients would unduly burden Loehwing because it would have a deleterious effect on his ability to work as a financial advisor, in New Jersey or elsewhere.  The Non-Solicitation Covenant is all-encompassing, and is bounded only by the imagination of a reasonably informed financial advisor.  As executed, it purports to prohibit Loehwing from soliciting any person or entity identified as a prospective client (i.e., any and all individuals or entities identified or contacted by Newport for the purpose of becoming a Newport client prior to the termination of Loehwing's employment) by Loehwing, or by Newport and it employees, during the term of Loehwing's employment.  (See Non-Solicitation Covenant.)

The Non-Solicitation Covenant thus prohibits Loehwing from soliciting several groups of individuals and entities, including: (1) all of the entities and points of contact identified in the OneSource Lists, which include thousands of contacts located in New Jersey and surrounding states; (2) any other individual or entity identified by Newport in formal, written lists of prospective clients; and (3) any other individual or entity identified by other Newport employees as a prospective client, even if Loehwing was not aware of such identification.  This last category is the most troubling.  As noted above, financial advisors may identify

23

prospective clients by reviewing public documents maintained by the PBGC.  With this in mind, it appears that the Non-Solicitation Covenant would effectively prevent Loehwing from soliciting <u>any</u> entity, for fear that Newport or its employees may have identified that entity as a prospective client during the term of his employment at Newport.  Indeed, to ensure that he did not breach the Non-Solicitation Covenant, it appears that Loehwing -- who now works for a Newport competitor -- would have to submit his prospective clients to Newport for its pre-approval.  Such a situation is untenable, for obvious reasons.

The Court may have reached a different conclusion if Newport and Loehwing had executed an agreement that differentiated between prospective clients with whom Loehwing had substantial contact, and those with whom he had little or no contact.  Indeed, the New Jersey Supreme Court has tacitly approved such an agreement, albeit in dictum.  <u>See, e.g.</u>, <u>Solari</u>, 55 N.J. at 586 (noting that the plaintiffs expressed that their legitimate interests would be adequately protected by a limited restraint against former employee's dealing with plaintiffs' actual customers or prospective customers with whom he had substantial dealings).[7]

---

[7] This passage, despite Newport's contrary assertions, is dicta.  (<u>See</u> Newport Br. at 24-25.)  It was not part of the <u>Solari</u>

(***footnote continued on next page***)

But the parties did not execute such an agreement, and the Court will not read such terms into the Non-Solicitation Covenant as it now exists.  See Textron Fin.-N.J., 2012 WL 1079613, at *16 ("The Court may not read or enforce [the contract's] provisions in a way that writes a different or better contract for the parties." (citation omitted) (internal quotation marks omitted)).

The Court also concludes that enforcing the Non-Solicitation Covenant would significantly impair the public interest.  "[T]he nature of the consulting business involves close contact between the consultants and the . . . employees of the client.  It is a personalized service giving rise to an interest in the public to choose among competing providers."  A.T. Hudson & Co., 216 N.J. Super. at 433.  In A.T. Hudson & Co., the Appellate Division found that "the record in the present case contains a great deal of evidence indicating that consulting firms expend great energy and money in soliciting clients" and that "the record does not indicate that customers experienced any real difficulty locating other consulting firms capable of rendering the same services".  Id. at

(*footnote continued from last page*)

court's holding and should not be afforded the force of law. Indeed, the New Jersey Supreme Court may choose to later revisit this issue, if it is presented with an appropriate action.  Cf. Kirtsaeng v. John Wiley & Sons, Inc., No. 11-697, 2013 WL 1104736, at *19 (U.S. Mar. 19, 2013) ("[T]he statement is pure dictum. . . . And it is unnecessary dictum even in that respect.  Is the Court having once written dicta calling a tomato a vegetable bound to deny that it is a fruit forever after?").

433-34.  No such evidence exists in this case.  The record, as highlighted by Newport and Loehwing, reveals only that Newport expended $1,985 to purchase the OneSource Lists.  This is not, in the Court's estimation, the sort of "great energy and money" that the Appellate Division referred to in A.T. Hudson & Co.

## V.   CONCLUSION

The Court, for the foregoing reasons, has concluded that the Non-Solicitation Covenant is: (1) enforceable as applied to Newport's actual clients; and (2) unenforceable as applied to Newport's prospective clients.  Accordingly, Loehwing is liable for breach of contract only insofar as he has solicited Newport's actual clients.[8]  The Court will thus issue a separate Order and Judgment, granting the Motion, granting the Cross Motion insofar as it concerns Newport's actual clients, and denying the Cross Motion insofar as it concerns Newport's prospective clients.


                                   s/ Mary L. Cooper
                              **MARY L. COOPER**
                              United States District Judge


Date:      March 28, 2013

---

[8] Because the parties did not brief any issues relating to equitable relief or damages, the Court has construed the Motion and Cross Motion to concern only the issue of liability.